FILED
2021 Feb-22  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARY BERNARD HARMON** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE** |
| | ) | **NUMBER:** _____ |
| **HARTFORD LIFE AND** | ) | |
| **ACCIDENT INSURANCE** | ) | |
| **COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Mary Bernard Harmon, and hereby files her Complaint against Hartford.

## PARTIES

1.     The Plaintiff, Mary Bernard Harmon ("Ms. Harmon"), is an insured under Group Long Term Disability Plan for employees of The CORE Group, Inc., identified as Group Insurance Policy GP-806469-GI ("the Plan"), who has been improperly denied disability benefits under the Plan.

2.     Defendant, Hartford Life and Accident Insurance Company ("Hartford"), is the Administrator of the Plan. Upon information and belief, Hartford is a foreign corporation incorporated in the State of Connecticut, which conducts business generally in the State of Alabama and specifically within this district.

## JURISDICTION AND VENUE

3.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  Plaintiff asserts claims for long term disability ("LTD") benefits, enforcement of ERISA rights and statutory violations of ERISA under 29 U.S.C. § 1132, specifically, Ms. Harmon brings this action to recover benefits due to her pursuant to 29 U.S.C. §1132(a)(1)(B) and to enforce her rights under the Plan pursuant to 29 U.S.C. §1132(a)(3).  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §§ 1132(a), (e)(1) and (f) and 28 U.S.C. § 1131. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## INTRODUCTION

4.      The Plaintiff in this case was subjected to improper claim handling procedures by Hartford as it exploited the shortcomings of ERISA as it relates to claims for "welfare" benefits to avoid paying Ms. Harmon's valid claim for disability benefits. The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit Plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). Ms. Harmon, as an employee insured for disability, was supposed to be treated as a beneficiary by Hartford as a statutory fiduciary. Instead, Hartford has breached those duties and victimized Ms.

Harmon by engaging in improper claim handling procedures. As described in more detail below, Hartford has clearly engaged in bad faith claim handling and Ms. Harmon, at minimum, is entitled to *de novo* review and all relief that ERISA provides.

## STATEMENT OF FACTS

5.     Ms. Harmon is an insured for benefits under the Plan. Hartford is the administrator of the Plan. The Plan provides insureds, like Ms. Harmon, LTD benefits and was in full force and effect at all times relevant to this Complaint.

6.     At all relevant times, Ms. Harmon was employed by The CORE Group and was a covered participant in the Plan, as defined in 29 U.S.C. § 1002(7) and under the terms and conditions of the Plan.

7.     Ms. Harmon, a woman fifty-seven (57) years of age, worked at HOPCO Foodservice Marketing under The CORE Group until her disabilities forced her to stop working on or about August 28, 2017.

8.     Ms. Harmon was employed by HOPCO Foodservice Marketing as a Sales Associate, whose job duties required the maintenance and development of sales through product presentations and sales training; preparation of sales contracts and programs; meeting a required number of sales calls, presentations, and sales closure rates; maintaining and updating information included buyer contacts, market segments, buying group affiliations, and client competitive information;

coordinating sales reports, programs, and samples; preparing for and securing necessary sales tools for professional sales presentations; and supporting team efforts via company sales meeting, food shows, vendor fairs, and district sales meetings. To perform these duties, an employee must meet deadlines both with and without supervision, interact professionally with coworkers and clients, work both independently and as a team, and maintain regular and predictable attendance. Frequent sitting, standing, and walking, regular use of hands and arms, and frequent lifting and moving up to fifty pounds were required in this position.

9.     Ms. Harmon's medical disabilities include familial chylomicronemia syndrome ("FCS"), recurrent pancreatitis, hypertriglyceridemia, diabetes mellitus, autoimmune thyroiditis, lumbar synovial cyst, lumbar spondylolisthesis, lumbar radiculopathy, depression, and anxiety. The symptoms of her impairments and the side effects of the medications and treatment prescribed render Ms. Harmon unable to perform any job.

10.     Ms. Harmon was approved and began receiving LTD benefits from Hartford on November 28, 2017.

11.     On May 8, 2018, Ms. Harmon was informed by the Social Security Administration that she was deemed totally disabled as of August 23, 2017 forward.

12.     Ms. Harmon received continuous LTD benefits from November 28, 2017 through November 27, 2019, totaling two (2) years of continuous benefits.

13.     Ms. Harmon's LTD benefits were approved and paid from November 28, 2017 until November 27, 2019 because Hartford determined that she was unable to perform the substantial and material duties of her occupation, as defined under the Plan.

14.     However, by letter dated November 19, 2019, Hartford wrongfully terminated Ms. Harmon's LTD benefits beyond November 27, 2019.

15.     The Plan at issue, as governed by ERISA and relied upon to deny Ms. Harmon's long term disability benefits states, in part:

> Test of Disability
> Total Disability
>
> From the date that you first become disabled and until monthly benefits are payable for 24 months, under this plan you are totally disabled when you are not able to perform with reasonable continuity the substantial and material acts necessary to pursue your own occupation in the usual or customary way and you are not working in your own occupation
>
> After the first 24 months that any monthly benefit is payable during a period of disability, under this plan you are "totally disabled" when you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:
>
> (i) a reasonable distance or travel time from your residence in light of the commuting practices of your community; or
> (ii) a distance or travel time equivalent to the distances or travel time you traveled to work before becoming disabled; or
> (iii)   the regional labor market, if you reside or resided prior to becoming disabled in a metropolitan area.

16.     Using this test of disability, Hartford found Ms. Harmon disabled and approved her LTD benefits for two (2) years as Ms. Harmon's lumbar synovial cyst, lumbar spondylolisthesis, and lumbar radiculopathy prevented her from performing the essential duties of her occupation.

17.     However, on November 19, 2019, Hartford concluded that, following a change in the Policy's test of disability, Ms. Harmon was not disabled under the "Any Occupation" standard and terminated Ms. Harmon's LTD benefits.

18.     At all relevant times, and prior to the termination of Ms. Harmon's benefits, she was under the consistent care of Dr. Thomas A. Barringer ("Dr. Barringer"); her FCS specialist, Dr. Charles F. Lovell, Jr. ("Dr. Lovell"); her neurosurgeon, Dr. Richard A. Lytle, Jr. ("Dr. Lytle"); her gastroenterologist, Dr. Gerald W. Mank ("Dr. Mank"); her primary care physicians Dr. Ahmad Hijazi ("Dr. Hijazi"), Dr. Kyle Burnette ("Dr. Burnette"), and Dr. Zachary Sherrill ("Dr. Sherrill"); and her endocrinologist, Dr. Anthony Barber ("Dr. Barber").

19.     On November 6, 2017, Dr. Barringer provided a statement in which he outlined Ms. Harmon's diagnosis of the "rare lipid disorder" FCS, her secondary conditions of extreme triglyceride elevation and frequent bouts of acute pancreatitis which in turn led to a chronic pancreatitis, and her participation in an experimental drug study for this condition.

20.     Dr. Lytle provided an Attending Provider Statement on November 7,

2017 in which he noted that, due to Ms. Harmon's lumbar spondylolisthesis and lumbar cyst, "any & all job duties, any increased activity or walking causes pain to become worse."

21.     A letter from Dr. Lytle on November 7, 2017 noted that Ms. Harmon's lumbar surgery was postponed due to elevated A1C and low platelet count as well as a MRSA infection.

22.     A follow up statement from Dr. Lytle's office on November 27, 2017 noted that Ms. Harmon was to remain out of work until she underwent and recovered from lumbar surgery.

23.     Ms. Harmon also contacted Hartford on November 7, 2017 and was noted in the case notes to have "mentioned [she] has a very rare genetic disease named FCS that also has her OOW, EE wondering what she need to include to also support the condition besides her surgery."

24.     On November 28, 2017, Ms. Harmon contacted Hartford to inform them that her lumbar surgery was cancelled, specifically mentioning low platelet count and high A1C levels as the reason for this cancellation.

25.     Despite receiving information regarding Ms. Harmon's FCS and secondary diabetes, hypertriglyceridemia, and chronic pancreatitis from Dr. Barringer and from Ms. Harmon herself, a case note from Hartford dated November 28, 2017 stated only that Ms. Harmon ceased working due to spondylolisthesis and

lumbar cyst and that it would be reasonable to approve LTD and follow up for updated information regarding her lumbar surgery at a later date.

26.     Hartford predicated Ms. Harmon's initial LTD approval solely upon her lumbar spondylolisthesis and lumbar cyst with no mention of her FCS, chronic pancreatitis, hypertriglyceridemia, autoimmune thyroiditis, or diabetes mellitus, no attempt to collect records related to these diagnoses, and no attempt to contact any of the physicians who treated these conditions.

27.     On March 12, 2018, Dr. Lytle provided an Attending Provider Statement which noted Ms. Harmon's diagnosis of spondylolisthesis and lumbar facet cyst but stated that surgery would not be pursued until her A1C was controlled and her blood platelets were higher. Dr. Lytle went on to write that Ms. Harmon was incapable of "any & all duties, any increased activity or walking causes pain to worsen."

28.     On May 8, 2018, Ms. Harmon was informed by the Social Security Administration that she was deemed totally disabled as of August 28, 2017.

29.     In an August 27, 2018 LTD Claimant Interview, Ms. Harmon informed Hartford that her spinal surgery was postponed indefinitely due to complications from her FCS, which she reported to cause pancreatic inflammation and fatigue. Ms. Harmon also reported her participation in an experimental drug study for FCS which lowered her immune system.

30.     In the notes of this August 27, 2018 conversation, Hartford noted that the initial approval for LTD benefits was based upon Ms. Harmon's spine conditions and noted that "we have no medical in file regarding this other medical condition," despite Ms. Harmon providing this information to Hartford several months prior and Dr. Barringer having provided a letter on November 6, 2017 outlining Ms. Harmon's FCS, severe symptoms, and course of treatment.

31.     Dr. Hijazi provided a Capabilities and Limitations Worksheet as well as an Attending Provider Statement on September 17, 2018. These forms noted that, due to chronic pancreatitis and chronic back pain, Ms. Harmon suffered severe abdominal pain and joint pain making it difficult to ambulate, perform office work, or undertake any lifting or exertion.

32.     In a phone conversation with Hartford on December 11, 2018, Ms. Harmon again reiterated her diagnosis of FCS and noted that this condition made any surgery too high risk to undertake.

33.     In an Attending Provider Statement dated June 17, 2019, Dr. Hijazi noted Ms. Harmon's back pain and chronic pancreatitis, as well as her FCS, which he clarified to be a "Rare Disease." Dr. Hijazi noted that these diagnoses caused symptoms of chronic pain, fatigue, back pain, and abdominal pain.

34.     Dr. Barber provided an Attending Provider Statement on June 25, 2019 which stated Ms. Harmon suffered from diabetes, FCS, autoimmune thyroiditis, and

chronic pancreatitis, which caused chronic pain and necessitated constant glucose monitoring and administration of insulin four times per day. Dr. Barber further noted that Ms. Harmon's functional capacity was extremely variable due to her fluctuating blood glucose and chronic pain, and that Ms. Harmon required bed rest ten (10) to fourteen (14) days per month.

35.     Dr. Barber's Attending Provider Statement of June 25, 2019 noted that a full recovery was "Not likely."

36.     In an Attending Provider Statement dated October 9, 2019, Dr. Lytle stated that due to Ms. Harmon's synovial cyst of the lumbar facet joint, which was untreatable via surgery due to inadequate A1C and platelet count, Ms. Harmon was incapable of any job duties. Although lumbar epidural steroid injections were suggested, Dr. Lytle noted that these procedures would likely be impossible due to Ms. Harmon's pancreatitis.

37.     Dr. Lytle's Attending Provider Statement of October 9, 2019 noted that "She is disabled" and not expected to have a full recovery.

38.     A Capabilities and Limitations Worksheet from Dr. Lytle dated October 9, 2019 stated that "Patient remains disabled rom her radicular pain."

39.     Hartford referred Ms. Harmon's claim for an Employability Analysis Report, which was completed on October 24, 2019 and identified four occupations it deemed Ms. Harmon capable of. These four occupations all fell within the Light

range of physical exertion requirements, a category generally recognized to require lifting up to twenty (20) pounds and frequently lifting and carrying up to ten (10) pounds, a good deal of walking or standing, and sitting most of the time with some pushing and pulling of arm or leg controls.

40.     Hartford's Employability Analysis Report utilized the functional capabilities assigned to Ms. Harmon by Hartford's own Clinical Consultant Review, and not those opined by Ms. Harmon's own treating physicians.

41.     Despite Ms. Harmon's treating physicians' unequivocal opinions that Ms. Harmon was unable to return to any occupation, Hartford nevertheless deemed her capable of full-time work activity and by letter dated November 19, 2019 wrongfully terminated Ms. Harmon's LTD benefits.

42.     Despite being informed by Dr. Lytle and by Ms. Harmon herself that spinal surgery was impossible due to Ms. Harmon's FCS and diabetes, in denying her claim Hartford cited the fact that "… suggested surgery has not been conducted."

43.     Despite the numerous statements from her physicians regarding the severe and long-term effects of her FCS, Hartford claimed in its termination letter that "Familial chylomimcroanemia [sic] syndrome is a remote diagnosis and under medical management is not expect[ed] to produce functional loss."

44.     Hartford's opinion as reflected in the termination letter dated November 19, 2019, solely focused on Ms. Harmon's physical functionality and

failed to consider Ms. Harmon's non-exertional limitations.

45.     By and through counsel in a letter dated May 15, 2020, Ms. Harmon appealed the termination of her LTD benefits. Ms. Harmon included with her appeal letter additional medical records outlining the decline of her condition, information on FCS from the National Pancreas Foundation, and personal declarations from Ms. Harmon as well as her brother and sister-in-law.

46.     Several medical records appeared to be missing from Hartford's evaluation and were therefore included in Ms. Harmon's May 15, 2020 appeal letter.

47.     These records included a hospitalization between April 7, 2018 and April 14, 2018 for acute on chronic pancreatitis, FCS, chronic pain, and diabetes, as well as a visit to the Emergency Department on September 27, 2018 for severe side effects of her FCS drug trial. Regular primary care treatment notes for management of FCS, pancreatitis, back pain, and depression were also included with this May 15, 2020 appeal.

48.     A July 9, 2018 office note from Dr. Lovell, Mrs. Harmon's FCS specialist, was also included with this appeal, and documented Ms. Harmon's history of FCS contributing to numerous hospitalizations and including an episode of pancreatitis which resulted in respiratory failure.

49.     Dr. Lytle completed a Treating Provider Assessment Form on February 12, 2020 which noted severe symptoms secondary to Ms. Harmon's lumbar

foraminal stenosis, radiculopathy, and spinal stenosis and determined that Ms. Harmon was not capable working on a sustained, regular basis, was unable to perform sedentary work eight hours per day and five days per week, would be off task greater than 15% of the average workday due to her symptoms, and would require greater than twenty absences per month. Overall, Dr. Lytle deemed Ms. Harmon to be totally disabled.

50.    A psychiatric evaluation took place with Dr. Jake Whitener ("Dr. Whitener") on March 25, 2020, during which Ms. Harmon was observed to have dysphoric and nervous mood, depressed, blunted, and labile affect, and a PHQ-9 score of fourteen (14) indicating moderate depression.

51.    Dr. Mank provided a Treating Provider Assessment Form on May 8, 2020, in which he noted diagnoses of chronic pancreatitis, FCS, hypertriglyceridemia, gastroesophageal reflux disease, and recurrent pancreatitis, as well as severe pain and depression which necessitated multiple medical appointments and made her unable to maintain a normal work schedule. Dr. Mank deemed Ms. Harmon totally disabled and noted that Ms. Harmon was "unable to function normally in a day to day life situation, and especially in a gainfully employed circumstance."

52.    The medical file shows several primary care, endocrinology, neurosurgical, and psychiatric consultations throughout the spring of 2020 in order

to address her severe FCS, hypertriglyceridemia, diabetes, back pain, autoimmune thyroiditis, and chronic pancreatitis.

53.     In support of her appeal, Ms. Harmon provided two statements through which she outlined the effects of her disabling condition on her activities of daily living and her ability to return to work. Ms. Harmon recounted a long history of abdominal pain and severe pancreatitis attacks which required multiple hospitalizations, including one in which, following admittance for pancreatitis, she was placed in the ICU and was in a medically-induced coma for eleven days while experiencing multi-organ failure, ultimately remaining inpatient for nearly three weeks. Ms. Harmon recounted approximately fifteen separate hospitalizations for worsening pancreatitis before receiving a diagnosis of FCS.

54.     In her statements, Ms. Harmon stated that her frequent abdominal pain, bouts of pancreatitis, as well as diabetes and brain fog, resulted in frequent absences from work. She noted difficulty in planning or accomplishing tasks "because we never know when another attack might occur."

55.     In support of Ms. Harmon's appeal, her brother, Clint Bernard, submitted a declaration in which he noted Ms. Harmon's recurrent, severe, and sometimes life threatening pancreatitis attacks, and Mr. Bernard also noted that Ms. Harmon suffered a fatty tumor of the spine which caused constant pain but was unable to be surgically removed due to her recurrent pancreatitis.

56.     Mr. Bernard stated that Ms. Harmon experienced frequent pancreatitis, daily drops in blood sugar, and constant spinal pain which "makes common daily activities a constant struggle," and left her bedridden a great deal of the time.

57.     In support of Ms. Harmon's appeal, her sister-in-law, Katie R. Perkins, provided a declaration in which she noted, after observing Ms. Harmon's symptoms for several years, that Ms. Harmon experienced chronic pancreatitis, diabetes requiring insulin injections and vigilant monitoring, constant fatigue requiring bedrest, and subsequent depression and anxiety. Ms. Perkins stated that "Mary had a strong work history prior to becoming chronically ill. She has strived to be independent and financially responsible but is no longer able to work to support herself."

58.     On May 18, 2020, by and through counsel, Ms. Harmon provided updated medical records from Dr. Barber.

59.     A Treating Provider Assessment Form from Dr. Barber dated May 13, 2020 stated that "Mary has familia chylomicronemia syndrome which was diagnosed in 2014 with genetic testing. She has a long history of recurrent pancreatitis requiring hospitalization & has had to be intubated. She also has elevated thyroglobulin antibody titers and type 1 diabetes."

60.     Dr. Barber further stated that Ms. Harmon's FCS was the cause of multiple hospitalizations and intubations, that Ms. Harmon suffered intermittent

severe abdominal pain due to pancreatitis secondary to hypertriglyceridemia, and that Ms. Harmon experienced severe and unexaggerated pain incompatible with any work activity. Dr. Barber noted that Ms. Harmon was totally disabled and unable to perform even sedentary work on a sustained, regular basis.

61.     Despite providing proof of her disability both before the termination of benefits and throughout the appeals process, Hartford refused to award Ms. Harmon's LTD benefits and issued its final termination by letter dated October 12, 2020.

62.     In its final termination letter dated October 12, 2020, Hartford relied on the opinions of paid medical reviewers Dr. Jeffrey B. Danzig ("Dr. Danzig"), Dr. Eric Kerstman ("Dr. Kerstman"), and Dr. Elizabeth Gay ("Dr. Gay").

63.     Dr. Danzig, whom has never seen nor treated Ms. Harmon, determined that Ms. Harmon did not suffer impairment from a gastroenterological or internal medicine perspective and, although recognizing past bouts of acute pancreatitis, emphasized that evidence of acute pancreatitis was found "in the time frame mentioned."

64.     The time frame commented on by Dr. Danzig in his review of the medical records spanned from November 28, 2019 to February 26, 2020, a mere three months. Conversely, the medical file and statements from treating physicians going back several years document multiple episodes pancreatitis with several

hospitalizations for this condition.

65.     Dr. Danzig also asserted that there was no evidence of chronic pancreatitis within the medical file, contradicting the numerous statements of Ms. Harmon's treating physicians who documented longstanding chronic pancreatitis.

66.     Dr. Danzig's assertion that "the claimant's FCS lead to hypertriglyceridemia which can cause bouts of pancreatitis, but otherwise does not lead to functional impairment" contradicts the numerous assessments and opinion statements, as well as the records of treatments and hospitalizations, provided by Ms. Harmon's own treating physicians.

67.     Upon reaching out to Ms. Harmon's endocrinologist, Dr. Barber, Dr. Danzig asked only three questions and was informed that Ms. Harmon's diabetes was secondary to chronic pancreatitis, that Dr. Barber considered Ms. Harmon to be impaired due to pain from chronic pancreatitis, and that Ms. Harmon's chronic pancreatitis was a clinical diagnosis.

68.     Despite this conversation, Dr. Danzig stated that "Dr. Anthony Barber did not provide any information in our conversation to support the need for any restrictions/limitations from a Gastroenterology/Internal Medicine perspective."

69.     Dr. Barber responded to a request for comment on Dr. Danzig's evaluation on August 5, 2020, stating that while he did not perform disability evaluations, "chronic pancreatitis should be main reason & her Gastroenterologist

should be person responding."

70.    Dr. Kerstman, whom has never seen nor treated Ms. Harmon, acknowledged that she did require some restrictions and limitations due to chronic pain, abdominal pain, fatigue, low back pain, chronic right lower extremity radiculopathy, and degenerative lumbar spine disease, yet he ultimately concluded that "I do not agree that the claimant is totally impaired" and that Ms. Harmon remained capable of full time work.

71.    Dr. Kerstman's opinion directly contradicted the assessments of Dr. Lytle, Dr. Mank, and Dr. Barber, all of whom determined that Ms. Harmon was totally disabled.

72.    Dr. Kerstman was not able to contact Dr. Lytle or Dr. Sherrill, and was only able to speak to a colleague within Dr. Lytle's office who was unable to comment on Ms. Harmon's clinical status or work capacity.

73.    Dr. Gay, whom has never seen nor treated Ms. Harmon, concluded that there was no evidence from a psychological perspective to support restrictions or limitations.

74.    Dr. Gay noted a March 23, 2020 psychiatric evaluation but dismissed Ms. Harmon's reported symptoms of depression and anxiety as inconsistent with her level of care, in spite of the care Ms. Harmon received for depression from her primary care physician prior to her psychiatric referral.

75.     Following these paid reviews, Hartford referred Ms. Harmon's claim for an Employability Analysis Addendum on July 24, 2020, which again identified four occupations which were deemed appropriate for Ms. Harmon's level of functionality.

76.     This Employability Analysis utilized the restrictions and limitations imposed by Dr. Kerstman, Hartford's paid reviewer, and not those assigned by Ms. Harmon's own treating physicians.

77.     By and through counsel, Ms. Harmon provided a response to the paid reviews of Dr. Danzig, Dr. Kerstman, and Dr. Gay, including the August 5, 2020 statement from Dr. Barber, on August 18, 2020.

78.     Mrs. Harmon's claim was referred a second time to Dr. Kerstman and Dr. Danzig, who both stood firm in their opinions that Ms. Harmon remained capable of sedentary work.

79.     Hartford relied upon the opinions of its paid reviewers over those of Ms. Harmon's treating physicians and on October 12, 2020 issued a final denial of Ms. Harmon's LTD benefits. Hartford informed Ms. Harmon that "If you don't agree with the final appeal decision, you can file a lawsuit under section 502(a) of a law called ERISA."

80.     As of this date, Ms. Harmon has been denied benefits rightfully owed to her under the Plan.

81.     Ms. Harmon has met and continues to meet the Plan's definition of disabled.

82.     Ms. Harmon has exhausted any applicable administrative review procedures and his claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

83.     Hartford's refusal to pay benefits has caused tremendous financial hardship on Ms. Harmon.

## STANDARD OF REVIEW

84.     A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan.

85.     When discretionary authority is clearly granted and the insurer of an ERISA plan also acts as a claims administrator, there is a structural or inherent conflict of interest that mandates a heightened arbitrary and capricious standard of review.

86.     Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Hartford or to any other entity who may have adjudicated Ms. Harmon's claim. Therefore, the Court should rview Ms. Harmon's claim for benefits under a *de novo* standard.

87.     Upon information and belief, Hartford evaluated and paid all claims

under the LTD Plan at issue, creating an inherent conflict of interest.

88.     Hartford has failed to comply with the letter of the claims procedures outlined in ERISA and therefore Ms. Harmon's claim for benefits should be reviewed by this Court under a *de novo* standard.

89.     In the alternative, if the Court finds that Hartford is entitled to the heightened arbitrary and capricious standard of review, the termination of Plaintiff's benefits constitutes a clear abuse of discretion as Hartford's decision to deny Ms. Harmon's LTD benefits was arbitrary and capricious.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

90.     Hartford has wrongfully denied LTD benefits to Ms. Harmon, in violation of the policy provisions and ERISA, for the following reasons:

(a) Ms. Harmon is totally disabled, in that she is not able to engage with reasonable continuity in any occupation in which she could reasonably be expected to perform satisfactorily in light of her age, education, training, experience, station in life, and physical and mental capacity;

(b) Ms. Harmon is entitled to disability benefits under the terms of the Plan, as she meets the Plan's definition of disability and she has otherwise met the conditions precedent of the Plan for coverage and entitlement to benefits;

(c) Hartford failed to accord proper weight to the evidence in the administrative record showing that Ms. Harmon is totally disabled; Hartford's interpretation of the definition of disability contained in the Plan is contrary to plain language of the Plan, unreasonable, arbitrary, capricious, and otherwise violated the standards required by ERISA;

(d) Hartford failed to obtain and consider relevant information pertaining to Ms. Harmon's disability before it made a final determination on her claim for LTD benefits;

(e) Hartford wrongfully denied Ms. Harmon a full, fair and impartial review of her benefits claim pursuant to 29 C.F.R § 2560.503-1(h)(1), by ignoring the overwhelming weight and credibility of evidence submitted and instead behaved as an adversary, looking instead for less credible evidence of marginal significance to support its goal of denying her benefits claim;

(f) Hartford failed to give proper weight to Ms. Harmon's own accounts regarding the debilitating effects of her pain;

(g) Hartford ignored the records and opinions of Ms. Harmon's treating physicians which show that Ms. Harmon is totally disabled, and instead based its decision to deny benefits on its internal review by

Hartford staff members and its paid reviewers, who had never seen or treated Ms. Harmon, some of which never spoke with her treating physicians about the nature of her disability, and who were not as qualified as Ms. Harmon's treating physicians to formulate opinions regarding the nature and extent of her disability;

(h) Harford failed to exercise reasonable flexibility in its claims review process to assure Ms. Harmon a full, fair review, well-reasoned, and principled of her claim;

(i) Hartford administered Ms. Harmon's claim for LTD benefits while acting under an inherent and substantial conflict of interest in that Hartford served both as fiduciary of and funding source for the Plan, and placed its own pecuniary interests above Ms. Harmon's interests in wrongfully terminating her LTD benefits and failing to administer the Plan as an impartial decision-maker, free of such conflict of interest, would;

(j) Hartford made erroneous interpretations of some evidence in violation of its obligation to discharge its duties with care, prudence, skill, and diligence;

(k) Hartford acted in bad faith by denying Ms. Harmon's claim based upon the inability of Hartford's paid reviewers to find Ms. Harmon

disabled, and otherwise failed to administer the Plan honestly, fairly and in good faith, and to at all times act in Ms. Harmon's best interests;

(l) Hartford terminated Ms. Harmon's benefits without the support of any new information that showed improvement in Ms. Harmon's medical condition, when in fact, her treating physicians opined that her condition continued to deteriorate as it had over the course of her disability claim;

(m)   Hartford failed to support the termination of benefits with substantial evidence;

(n) Hartford imposed a standard not required by the Plan's provisions, by requiring objective evidence of Ms. Harmon's subjective medical conditions where such evidence cannot be reasonably provided;

(o) Hartford denied Ms. Harmon's claim for a lack of objective medical evidence when Ms. Harmon has provided ample subjective evidence of a disability and Hartford has neither identified any objective evidence that Ms. Harmon could have supplied to support the claim and has not had Ms. Harmon undergo an independent medical examination or a similar in-person probative procedure to test the validity of her complaints;

(p) Harford failed to consider Ms. Harmon's non-exertional limitations caused by her disability, such as the side effects of her prescribed medication, her ability to regularly attend work, and the effect her disability has on her concentration, persistence and pace when performing the material duties of her occupation;

(q) Hartford's termination of Ms. Harmon's LTD benefits failed to provide a detailed explanation and the basis of its disagreement with the opinions of Ms. Harmon's treating physicians;

(r) Hartford's termination of Ms. Harmon's LTD benefits failed to provide a detailed explanation and the basis of its disagreement with the disability determination by the Social Security Administration;

(s) Hartford failed to consider the Social Security Administration's finding of disability in its evaluation, despite its obligation to consider such evidence, and instead diminished Ms. Harmon's approval for SSDI benefits while ignoring the evidence generated by the Social Security Administration in investigation of this claim;

(t) Hartford wrongfully denied Ms. Harmon's LTD benefits in such other ways to be shown through discovery and/or hearing.

91.   As a result of the foregoing, the relief to which Ms. Harmon is entitled includes: (1) monthly LTD income benefits to Ms. Harmon, (2) payment of back

benefits from November 28, 2019 to the date of judgment, (3) pre-judgment interest, (4) equitable relief, including declaratory and injunctive relief, to redress Hartford's practices that are violative of the Plan and ERISA, and to enforce the terms of the Plan and ERISA, and (6) an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## CAUSES OF ACTION

### COUNT ONE
### ERISA (Claim for Benefits Owed under Plan)

92.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

93.     At all times relevant to this action, Ms. Harmon was a participant of the Plan underwritten by Hartford and issued to The CORE Group and was eligible to receive disability benefits under the Plan.

94.     As more fully described above, the termination and refusal to pay Ms. Harmon's benefits under the Plan for the period from at least on or about November 28, 2019 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA. The decision to deny benefits to Ms. Harmon constitutes an abuse of discretion as the decision was not reasonable and was not based on substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for the following:

1.      A judgment ordering the applicable standard of review in this case is *de novo*;

2.      A judgment ordering that by a preponderance of the evidence, the Defendant has breached its fiduciary duty to the Plaintiff by wrongfully denying her LTD benefits owe to her through the Plan;

3.      In the alternative, if the Court determines that the applicable standard of review is the heightened arbitrary and capricious standard, the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate arbitrary and capricious review and enter a judgment that Defendant's decision to wrongfully deny Plaintiff's LTD benefits was unreasonable, arbitrary and capricious, and unsupported by substantial evidence;

4.      Declaratory and injunctive relief, finding that Defendant violated the terms of the Plan and Plaintiff's rights thereunder by terminating Ms. Harmon's LTD benefits, that Ms. Harmon is entitled to a continuation of further LTD benefits from Defendant pursuant to the Plan;

5.      Declaratory and injunctive relief, finding that Defendant breached its fiduciary duties to Plaintiff; enjoining Defendant from further violations of its fiduciary duties; and directing Defendant to take all actions necessary to administer the Plan in accordance with the terms and provisions thereof and Defendant's fiduciary and other obligations arising under ERISA;

6.      A judgment ordering Defendant to pay Ms. Harmon's LTD benefits from November 28, 2019 through the date judgment is entered herein, together with pre-judgment interest on each and every such monthly payment through the date of judgment;

7.      An award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g);

8.      For such other and further relief as the Court deems just, fit and proper.

Respectfully submitted this the 22nd day of February, 2021.

> _/s/ Peter H. Burke_____
> Peter H. Burke (ASB-1992-K74P)
> PBurke@burkeharvey.com
> BURKE HARVEY, LLC
> 3535 Grandview Parkway
> Suite 100
> Birmingham, Alabama 35243
> Phone: (205) 930-9091
> Fax: (205) 930-9054
>
> _Attorney for Plaintiff Mary Bernard Harmon_

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:**

Hartford Life and Accident Insurance Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL  36104